## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**U.S. SECURITIES AND EXCHANGE COMMISSION,**

                    **Plaintiff,**

    -against-

**THE HYDROGEN TECHNOLOGY CORPORATION, MICHAEL ROSS KANE, AND TYLER OSTERN,**

                    **Defendants.**

**Case No. 22-cv-08284**

**Jury Trial Demanded**

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "SEC"), for its Complaint, alleges as follows:

## SUMMARY

1.      This enforcement action arises from the unregistered offers and sales of crypto asset securities and market manipulation scheme by Defendants The Hydrogen Technology Corporation ("Hydrogen"), a financial technology ("fintech") company based in Miami, Florida, its former President and CEO, Michael Ross Kane, and Tyler Ostern, President and CEO of Moonwalkers Trading Limited ("Moonwalkers").

2.      From January 2018 through April 2019 (the "Relevant Period"), Hydrogen and Kane, offered and sold crypto asset securities called Hydro tokens ("Hydro") and privately hired Ostern to fraudulently manipulate the price and volume of Hydro tokens traded on crypto asset trading platforms so that Hydrogen could sell its own Hydro tokens at a greater profit.  As a

result of these unregistered offers and sales and fraudulent manipulation of the Hydro market, Hydrogen reaped profits of over $2.2 million.

3.      Hydrogen was formed in December 2017, when it was created out of, and obtained all of the technology, intellectual property, and employees of, Hedgeable, Inc., an SEC-registered investment adviser, at which Kane was President and CEO.  Kane directed the creation of Hydrogen to raise much-needed capital, including through a token offering, sale, or distribution.

4.      In January 2018, Hydrogen created, or "minted," 11,111,111,111 Hydro tokens and devised a plan to raise capital for Hydrogen by publicly distributing, offering, and selling Hydro to create and grow a market for Hydro so that Hydrogen and Kane could profit from the sale of the company's own Hydro on crypto asset trading platforms.  In an effort to create a consumptive use for the Hydro token, Hydrogen and Kane planned to create a blockchain-based software ecosystem called the "Hydrogen platform" and to develop and release so-called "Hydro protocols" on that platform, which users would ostensibly use by paying with Hydro tokens.

5.      Hydrogen and Kane carried out their plan to distribute, offer, and sell Hydro in four overlapping phases:  (1) in January and February 2018, Hydrogen distributed Hydro through an "airdrop" or public "giveaway" of tokens; (2) in February 2018 and, again, beginning in May 2018, Hydrogen held two bounty programs that provided Hydro to participants in exchange for completing tasks promoting the Hydro token and the Hydrogen platform; (3) between February and October 2018, Hydrogen distributed Hydro tokens to the company's employees as compensation; and (4) from May 2018 through April 2019, Hydrogen and Kane, including through Ostern, executed controlled sales of the company's Hydro on crypto asset trading platforms.

6.      Kane began selling the company's Hydro through crypto asset trading platforms in May 2018, but soon after learned that selling a significant volume of Hydro would depress the token's price and hinder his efforts to raise much-needed capital for Hydrogen.  As a result, in October 2018, Kane privately hired and directed Ostern and his company, Moonwalkers, a self-described crypto asset "market maker," to manipulate Hydro's trading price and volume so that the company's Hydro sales would be more profitable.  Moonwalkers did so by creating the false appearance of robust Hydro trading and artificially propping up the token's price.

7.      Specifically, at Kane's direction, Ostern used a customized trading bot (a computer program that automates trades) to sell the company's Hydro through Kane's personal trading accounts on crypto asset trading platforms.  Among other manipulation tactics, Ostern placed and canceled both buy and sell orders at random increments to artificially inflate the Hydro token's trade volume and price, thereby enabling sales of the company's Hydro to be more profitable.

8.      Ostern provided Kane and Hydrogen with regular updates on his market manipulation efforts.  For example, on October 11, 2018, just days after the Hydro market manipulation began, Ostern told Kane that he was "starting off slow, trying to keep the sell pressure minimal until [he could] build enough capital to really get the market moving upward" and indicated that they would "have plenty of excuses to pump price and sell into the FOMO [fear of missing out] guys down the road."  Two weeks later, Ostern told Kane about his "volume shenanigans" on a popular, high-volume crypto asset trading platform, and bragged that it had taken his bot "about 3 seconds" to generate the illusion that "a million" Hydro tokens had been bought and sold—"[a]round half" of which Ostern admitted was "fake."

9.      In addition, and as set forth more fully herein, the Hydro distributed by Hydrogen and Kane through the bounty programs, employee compensation, and sales in the crypto asset trading market, including through Ostern, were offered and sold as investment contracts, and therefore were securities whose offer or sale required registration with the SEC unless an exemption from registration was available.  Hydrogen and Kane did not file a registration statement with the SEC for their offers or sales of Hydro, and no exemption from registration was available.

10.     By engaging in the misconduct described herein, the Defendants violated numerous provisions of the federal securities laws, including certain registration, antifraud, and market manipulation provisions, as detailed below.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

11.     The SEC brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

12.     The SEC seeks a final judgment against Hydrogen and Kane:  (a) permanently enjoining them from engaging in acts, practices, and courses of business alleged herein; (b) ordering them to disgorge, on a joint and several basis, their ill-gotten gains and pay prejudgment interest thereon pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (d)(7)]; (c) imposing civil money penalties on them pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently enjoining Hydrogen and Kane from participating in an offering of crypto asset securities or other securities and from violating the federal securities laws alleged in this Complaint, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C.

§ 78u(d)(5)]; and (e) prohibiting Kane from acting as an officer or director of any public

company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

13.     The SEC also seeks a final judgment against Ostern:  (a) permanently enjoining

him from engaging in acts, practices, courses of business, and violations alleged herein;

(b) ordering him to disgorge his ill-gotten gains and pay prejudgment interest thereon pursuant to

Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (d)(7)];

(c) imposing civil money penalties on him, pursuant to Section 20(d) of the Securities Act [15

U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(d) permanently enjoining Ostern from participating in an offering of crypto asset securities or

other securities, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections

20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections

21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants,

directly and indirectly, have made use of the means or instruments of transportation or

communication in, and the means and instruments of, interstate commerce, or of the mails, in

connection with the transactions, acts, practices, and course of business alleged herein.

15.     Venue in the Southern District of New York is proper pursuant to Section 27 of

the Exchange Act [15 U.S.C. § 78aa].  Defendants conducted certain transactions, acts, practices,

and courses of business constituting the violations alleged herein within this district, including

offering and selling Hydro while in this district and to U.S. persons located in this district.  In

addition, Defendants minted, distributed, marketed, listed on crypto asset trading platforms,

and/or coordinated the offers and sales while in this district, and Hydrogen and Kane did so from

Hydrogen's office, which was located in this district during the Relevant Period.

## DEFENDANTS

16.     **The Hydrogen Technology Corporation** is a privately-held Delaware

Corporation and currently is headquartered in Miami, Florida.  During the entire Relevant

Period, Hydrogen was headquartered in New York, New York.  Hydrogen is a spin-off of

Hedgeable, Inc. ("Hedgeable"), which was also a Delaware corporation headquartered in New

York, New York.  Hedgeable was registered with the SEC as an internet investment adviser from

2009 through December 2018, when its registration was terminated.  On December 21, 2018,

Hedgeable settled with the SEC for violations of Sections 204, 206(2), and 206(4) of the

Investment Advisers Act of 1940 and certain Rules thereunder, in connection with the

dissemination of false and misleading marketing materials and performance data, and agreed to

pay an $80,000 civil penalty.  Hydrogen's primary business during the Relevant Period was

centered on its application programming interface ("API") solution, which Hydrogen's clients,

mainly banks and other financial institutions, pay Hydrogen to use in order to access the

company's data models for account and portfolio management.

17.     **Michael Ross Kane**, age 37, was Hydrogen's CEO and Head of Business during

the entire Relevant Period, and until December 2018 was President, CEO, and Head of Business

of Hedgeable.  During the Relevant Period, Kane resided in New York City and, later, Miami

Beach, Florida, where he currently resides.  During the SEC's investigation that preceded this

action, Kane invoked his Fifth Amendment privilege against self-incrimination, refusing to

answer questions during sworn testimony.

18.    **Tyler Ostern**, age 28, resides in Coos Bay, Oregon and during the Relevant Period resided in Charlotte, North Carolina, then Myrtle Beach, South Carolina, and, after that, West Fargo, North Dakota.  At all times relevant to this Complaint, Ostern was the President, CEO, and head trader of Moonwalkers, a South African-incorporated company and self-described "marketing firm" or "market maker" for crypto assets.  Ostern has never been registered with the SEC in any capacity.

## BACKGROUND ON CRYPTO ASSETS

19.    The term "crypto asset" (or, sometimes referred to as a "digital asset") generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "cryptocurrencies," "coins," and "tokens."[1]

20.    Entities have offered and sold crypto assets in fundraising events, often called initial coin offerings ("ICOs"), in exchange for consideration.  Generally, crypto assets may entitle holders to certain rights related to a venture underlying the fundraising event, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  Issuers of crypto assets typically release a "whitepaper" or marketing materials describing the project and the crypto asset.

21.    After an initial distribution or sale by the issuer, crypto assets are often tradeable upon delivery, including on secondary markets on crypto asset trading platforms.  Secondary market transactions allow investors to buy and resell securities originally sold by an issuer—for example, on exchanges or crypto asset trading platforms.  Secondary market trading in crypto

---

[1]    A blockchain or distributed ledger is a peer-to-peer database spread across a network, that records all transactions in theoretically unchangeable, digitally recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.  Blockchains or distributed ledgers can also record "smart contracts," essentially computer programs designed to execute the terms of a contract when certain triggering conditions are met.

assets has grown exponentially, and the announcement of the listing of a crypto asset, including a crypto asset security, often causes that asset's price and trading volume to rise.

22.     On secondary trading platforms, crypto assets are tradeable for other crypto assets (such as Bitcoin) or fiat currency, *i.e.*, legal tender issued by a country.

23.     The offers and sales of crypto assets must be registered with the SEC if they are offers and sales of securities, which the Securities Act defines to include an "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

## FACTUAL ALLEGATIONS

### I.     The Formation Of Hydrogen

24.     In December 2017, Hedgeable, an investment adviser registered with the SEC, spun off its fintech business and created a new, independent company called Hydrogen.

25.     Prior to creating Hydrogen, Hedgeable had come under increased regulatory scrutiny, including by the SEC, in connection with Hedgeable's robo-advisory business.[2]  As a result, Hedgeable, led by Kane, its CEO and a member of the company's board of directors ("Board"), began discussing internally a plan to separate the core of its business (technology, software, and employees) from its adviser business, in part, to insulate itself from regulatory oversight.

26.     Specifically, in mid-September 2017, Hedgeable began the process of pivoting its primary business to providing financial institution clients an API solution that would, among

---

[2]     Robo-advisers are digital investment advisers, platforms, or programs that provide automated or semi-automated investment advisory services, typically driven by algorithms and with little to no human supervision.

other functions, secure data used by its clients' mobile applications in addition to providing access to its data models for account and portfolio management.  As a part of that process, Hedgeable proposed creating a spin-off entity called "Hydrogen," which was the name of the company's API solution at the time, into which Hedgeable would transfer all of its intellectual property.  Around the same time, Kane informed Hedgeable's Board that the company was going to run out of cash by November 15, 2017.

27.     Creating a spin-off entity (what ultimately became Hydrogen), Kane claimed at a September 14, 2017 Hedgeable Board meeting, would accomplish three goals:  "1. Protect the IP and revenue of [the spin-off] entity completely from any regulatory action"; "2. Create fresh momentum to raise capital, get partners, and press"; and "3. Allow [them] to get involved in blockchain, ICO, and other areas without being under SEC scrutiny[.]"

28.     On or around November 20, 2017, Hydrogen was incorporated in Delaware, and the following day, Hedgeable transferred all of its technology, intellectual property, employees, and assets into Hydrogen.  The spin-off by which Hydrogen was formed was completed on or around December 12, 2017.

## II.     To Raise Needed Capital, Hydrogen And Kane Considered Fundraising Options, Including A Token Sale Or Distribution

29.     Throughout 2017, Hedgeable faced a worsening financial situation.  By early December 2017, Hedgeable had defaulted on its payroll obligations, owed its payroll provider $100,000, and estimated it needed $220,000 to continue its business through mid-December, when the company anticipated receiving $1.5 million pursuant to a convertible note it had secured months earlier from a customer agreeing to fund the spin-off entity, Hydrogen.  On December 4, 2017, Kane told a Hedgeable shareholder that the company was "out of cash, and

[was] anxiously awaiting the spin-out to be completed in order to receive [an] investment from [its enterprise customer] for $1.5m in a convertible note."

30.     As a result, and as part of the discussions leading to the decision to spin off and create Hydrogen, Kane and others at Hedgeable discussed ways to raise capital, including the creation, public distribution, and sale of a token.

31.     Towards the end of 2017, Kane led numerous internal conversations with future Hydrogen employees, members of Hedgeable's Board, and investors about Hydrogen's plan to sell a crypto asset called "Hydro" to the investing public, through a "token sale."

32.     At Hydrogen's first Board meeting on January 4, 2018, Kane provided updates on the Hydro "token sale/distribution" and blockchain project, including that in December 2017 Hydrogen had completed its whitepaper describing the project and the Hydro token ("Whitepaper") and demonstration videos.

33.     In the same Board update, Kane also presented the Board with "two viable distribution options" for the tokens after Hydrogen had "developers sign up for the Hydrogen API":  (1) a token sale, such as an ICO, or (2) a so-called "airdrop" or public "giveaway."  Kane summarized the pros and cons of each option in the following chart:

| | Pros | Cons |
|---|---|---|
| Token Sale | The standard way of distributing tokens "Free" revenue - we project $1-$10 Million | Greater standard to not be viewed as a security sale More operationally complex |
| Airdrop | Very little chance can be viewed as a security sale Very easy to administer | Grey area since not many firms have done it May be viewed negatively in the crypto space |

34.     In early 2018, Hydrogen and Kane opted not to pursue a traditional ICO (or label their offering as an ICO), to avoid "causing SEC problems."  Instead, and as describe more fully herein, they devised a plan to raise capital by publicly distributing, offering, and selling Hydro,

including to U.S. investors, through:  (1) an airdrop; (2) crypto asset "bounty programs",

(3) Hydrogen employee compensation, and (4) the creation of a robust secondary market on

crypto asset trading platforms to enable Hydrogen to directly offer and sell Hydro to investors.

### III.  The Hydrogen Platform And The Hydro Protocols

35.     As part of its plan to use Hydro to raise capital, Hydrogen proposed integrating

Hydro into a software ecosystem called the "Hydrogen platform."

36.     Hydrogen publicly described the Hydrogen platform on its website and

Whitepaper as an "ecosystem" composed of "four layers":  (1) the Ethereum blockchain,[3] (2) the

"Hydro protocols," which were to be smart contracts (*e.g*., coded software recorded on the

blockchain) to be used for validating user-security and user-identification, (3) applications built

by third-party developers on top of the Hydro protocols, and (4) platforms built by commercial

businesses on top of the preceding three layers.

37.     In or around January 2018, Hydrogen announced publicly, on its website and on

its social media pages and channels—all of which were accessible in the United States—that it

planned to develop and release five "Hydro protocols" in successive phases between 2018 and

2020, with each protocol purportedly requiring Hydro to operate.  However, four of the five

Hydro protocols were never finalized and released to the public while Hydrogen was offering

and selling Hydro tokens.

---

[3]     The Ethereum blockchain is an open, or permissionless, blockchain that is a record of
events, and that can allow for the use of "smart contracts."  Ether (or "ETH") is the Ethereum
blockchain's native token.  (Some crypto assets may be "native tokens" to a particular
blockchain—meaning that they are represented on their own blockchain, though other crypto
assets may also be represented on that same blockchain, as is the case with the Ethereum
blockchain.)

**IV.     Hydrogen And Kane Publicly Distributed, Offered, and Sold Hydro**

38.     During the fall of 2017, Kane led the company's Hydro-creation efforts, which included closely supervising testing of the Hydro token in a closed-system format, as well as instructing others to create and review videos explaining how the Hydro token integrated into the Hydrogen platform.

39.     In early January 2018, under Kane's direction, Hydrogen minted a finite supply of 11,111,111,111 Hydro tokens.  The Hydro token is an ERC-20 standard token on the Ethereum blockchain.[4]

40.     In its materials publicly marketing and promoting the Hydro token, Hydrogen and Kane told potential investors that a significant percentage of minted Hydro would be set aside for the company and its development team.  For example, in a January 18, 2018 post on Hydrogen's thread on bitcointalk.org, Hydrogen stated that 20% of the token supply would be reserved for the company in "a treasury," and another 30% would be reserved for the company's development team.

41.     Later, in a May 18, 2018 post on Hydrogen's Medium blog, titled "Understanding The Hydro Token Distribution," Hydrogen stated that 35% (nearly 3.89 billion Hydro) had been allocated to the company's repository and 26% (just over 2.92 billion Hydro) to its current internal developer team, with another 5% set aside for the company's future internal development team.

42.     Hydrogen and Kane publicly marketed Hydro as a so-called "utility" token on the company's website and its social media pages and channels, initially claiming that it would

---

[4]     ERC-20 is a standard protocol (or technical specification of the type of crypto token) currently used by a majority of issuers on the Ethereum blockchain to create tokens that are represented on the Ethereum blockchain.

function as an "API key" within Hydrogen's existing non-blockchain API business. However, at no point during the Relevant Period, including during the offers and sales of Hydro, could the token be used within Hydrogen's existing non-blockchain API.

43.     Hydrogen's and Kane's plan to distribute, offer, and sell the Hydro token proceeded in four overlapping phases:

        a.      The Hydro airdrop was the first phase of Hydrogen's and Kane's plan to publicly distribute, offer, and sell Hydro tokens. It began in January and ran through February 20, 2018. Kane directed the marketing and execution of the Hydro airdrop, including directing the creation of the airdrop application on Hydrogen's website and providing certain Hydrogen shareholders and others with instructions on how to sign up for the airdrop. Hydrogen's and Kane's goal in carrying out the airdrop was to widely disseminate and promote the Hydro token to create a broad secondary market for Hydro, into which the company could later sell its Hydro for profit. Hydrogen never placed any restriction on the resale of airdropped, or indeed any other, Hydro tokens. On February 19 and 20, 2018, Hydrogen airdropped, or distributed, approximately 2.6 billion Hydro tokens to over 11,000 "developers."

        b.      In late February and again in May 2018, Hydrogen offered Hydro through bounty programs, pursuant to which Hydrogen paid Hydro to participants in exchange for completing bounty tasks promoting Hydro and the Hydrogen platform.

        c.      From mid-February through October 2018, Hydrogen and Kane distributed approximately 2.9 million Hydro to Hydrogen employees as part of their employment compensation.

        d.      Just days after the airdrop concluded in February 2018, Hydrogen and Kane began their efforts to have Hydro "listed," or made available for trading, on various crypto

asset trading platforms.  Hydrogen and Kane publicly announced each new listing on the
company's social media page and channels and in emails to Hydro token holders.  Beginning in
May 2018, Kane began selling Hydro from the company's repository to raise much-needed
capital, and, in October 2018, hired Moonwalkers to sell Hydro on crypto asset trading
platforms, to keep the price of the token afloat and ensure that the company's sale of its Hydro
would be more profitable.

44.     As set forth more fully below, the Hydro tokens that Hydrogen and Kane
distributed, offered, and sold through bounty programs, as employee compensation, and on
crypto asset trading platforms, including through Ostern, were offered and sold as investment
contracts and thus securities.  Each of these three phases of Hydrogen's and Kane's plan to
distribute, offer, and sell Hydro is addressed in turn.

**A.      Hydrogen's Distribution, Offer, And Sale Of Hydro Tokens To Bounty
Program Participants**

45.     Concurrent with the Hydro airdrop, beginning on or around January 25, 2018,
Hydrogen and Kane implemented a bounty program, whereby airdrop recipients could receive
payments of additional Hydro in exchange for completing certain promotional tasks, such as
translating the Whitepaper and other documents from English into other languages.

46.     At Kane's direction, Hydrogen advertised the bounty program on its website and
other online forums.

47.     In promoting the bounty programs and, more broadly, the Hydro token and
Hydrogen platform, Hydrogen and Kane emphasized the professional expertise and success of
the Hydro team by including their biographies, which featured previous work experiences at top
investment banks and consulting firms, awards received in the fintech space, their expertise in
"crypto-assets," speeches Kane was giving on the "power of the public blockchain to thousands

of European tech entrepreneurs," and the expected impact that the Hydrogen platform would have in the financial services ecosystem.  Hydrogen touted this information on the company website and in other Hydrogen protocol marketing materials.

48.     At Kane's direction, Hydrogen "hosted" its bounty campaign, called "Project Hydro," on Bounty0x, a popular crypto asset bounty-hunting platform.  The Project Hydro bounty campaign on Bounty0x consisted of eight different bounties, each with its own assigned bounty task and allotted Hydro token "reward."  For example, one bounty available as of January 29, 2018, was the "Reddit Bounty" pursuant to which bounty program participants would receive Hydro in exchange for "upvoting" (or signaling approval or, in Facebook parlance, "liking") "all posts" made by or from Hydrogen's Project Hydro account "for a week."

49.     To participate in the bounty program, participants were required to sign up on Bounty0x and provide their prior airdrop user credentials.  On completion of the bounty tasks, participants were required to submit proof of completion, and, upon Hydrogen's approval, the company distributed Hydro to the bounty participants' digital wallets.

50.     In February 2018, Hydrogen distributed at least 238,666 Hydro to 177 bounty program participants in exchange for the services they provided to Hydrogen.

51.     Beginning in May 2018, Hydrogen, at Kane's direction, implemented a second bounty program.  Pursuant to this second bounty program, developers called "Decentralization Ambassadors" ("DAs") could and were expected to market and promote Hydro and the Hydrogen platform across various online social media platforms and channels, monitor those platforms and channels, and identify potential Hydro use-applications (or "dApps") for social media discussion.

52.     In exchange for completing these tasks (or as Hydrogen called them "duties"), DAs would, and did, receive Hydro.  For example, in a July 9, 2018 post on its Medium blog, Hydrogen told potential DAs that they would receive 222,222 Hydro per month over 24 months.

53.     One of the bounty tasks DAs could complete was "[b]ringing and onboarding new developers into the [Hydrogen] ecosystem," to whom Hydrogen would distribute Hydro.

54.     Between at least August and November 2018, Hydrogen distributed 35,434,611 Hydro to 19 DAs as part of this program.

55.     As with the airdropped Hydro, neither Hydrogen nor Kane placed any restriction on the resale of Hydro distributed to the participants in either of the two bounty programs.

**B.     Hydrogen's Distribution, Offer, and Sale Of Hydro Tokens To Its Employees As Compensation**

56.     In February 2018, as part of its plan to raise capital via distribution of Hydro, Hydrogen and Kane set aside about 3.4 billion Hydro to be issued to company employees.

57.     Beginning in mid-February 2018, Hydrogen distributed approximately 2.9 billion Hydro to its employees as part of their compensation for 2018.

58.     The initial distribution occurred on February 16, 2018, and included the distribution of approximately 1.38 billion Hydro to each of Kane and his brother, Hydrogen's co-founder and Head of Product (and current CEO), and approximately 278 million Hydro to each of Hydrogen's Blockchain Engineer and Head of Financial Engineering.

59.     Later, beginning in May 2018, Hydrogen distributed approximately 150 million Hydro to approximately 25 of its employees, company-wide.  This distribution was not limited to Hydrogen's internal development team, contrary to what Hydrogen and Kane had said publicly about reserving a percentage of the minted tokens only for that team.

60.     As with the Hydro distributed via Hydrogen's airdrop and bounty programs, neither Hydrogen nor Kane placed any formal resale restrictions on the Hydro tokens distributed to company employees.

61.     At the time of the May 2018 company-wide distribution, Hydrogen's external auditors, with assistance from Kane and others at Hydrogen, valued the Hydro token at approximately 0.4621 cents per token.  By contrast, at the time of the February 16, 2018 grant to Kane, his brother, and two others, Hydro was valued by the company's external auditors at approximately 0.000529 cents per token.  This difference in valuation was due primarily to the Hydro token's resale value on secondary trading markets as a result of Hydrogen's and Kane's efforts to have Hydro listed on several crypto asset trading platforms, described further below. Indeed, by the time of the May 2018 company-wide distribution, Hydro had already been listed on several crypto asset trading platforms.

**C.     Hydrogen And Kane Created A Trading Market For And Promoted The Profit Potential Of Hydro Tokens**

62.     Almost immediately after the airdrop concluded in February 2018, Hydrogen and Kane began their efforts to have Hydro listed on several crypto asset trading platforms.

63.     Upon receipt of the airdropped Hydro on February 19-20, 2018, Hydro token holders were asking, on Hydrogen's Telegram channel and other social media pages, if and when the Hydro token was going to be listed on crypto asset trading platforms.

64.     As part of the company's listing efforts, Hydrogen and Kane encouraged members on the Hydrogen Telegram channel to vote or petition for Hydro to be listed on crypto asset trading platforms.

65.     Kane spearheaded Hydrogen's efforts to list Hydro by identifying, filling out, and submitting listing applications to various crypto asset trading platforms, and liaising with their

representatives.  Hydrogen and Kane used a strategy of listing Hydro on as many low-trading-volume platforms as possible in order to able to eventually have Hydro listed on larger-volume and more-established trading platforms.

66.     Hydrogen's listing efforts resulted in Hydro being listed on at least 17 crypto asset trading platforms, including on March 22, March 30, April 24, and August 28, 2018.

67.     Hydrogen's official Twitter account publicly announced each new listing and repeatedly advertised that the Hydro token was available for trading on multiple crypto asset trading platforms, including two popular, high-volume platforms, one of which is based in the United States.

68.     Hydrogen also announced each new listing in its public Telegram channel, on Reddit, and through weekly update emails to its growing community of token holders, including those who had received Hydro via airdrop.  Kane drafted each of these new listing announcements.

69.     For example, in the April 2, 2018 weekly update email to Hydro token holders that Kane drafted, Hydrogen and Kane told Hydro token holders that certain crypto asset trading platforms had "added" Hydro on their platforms.

70.     Kane deliberately chose to use the word "added" rather than "listed," because he understood that "listing" a crypto asset on a trading platform, like listing equity stocks on an exchange, would make that crypto asset more likely to be viewed by investors as an investment—and thus a security.  In fact, in a March 21, 2018 internal conversation held via Slack, an online messaging application, Hydrogen's Head of Financial Engineering wrote Kane: "@Mike, we have a couple options.  (1) we can sort of contradict what we've stated before and now announce we're listing on exchanges for X reason . . . or (2) we can have a random person

who is not us make a post saying 'looks like Hydro is now trading on X exchange[.]"  In response, Kane wrote: "well I think we just say 'x platform' has added Hydro rather than 'we listed it' and keep saying that everytime, non-chalantly . . . I don't think we have to give any reason[.]"

71.     While Hydrogen and Kane worked to have Hydro listed on crypto asset trading platforms, the company fielded numerous questions on its social media pages and channels from Hydro recipients and purchasers about the token's value and whether and when Hydrogen expected the token's price to increase.

72.     At Kane's direction, Hydrogen created a set of scripted responses to these questions, being careful not to expressly state that the Hydro token would increase in value. Nevertheless, in conversations as early as April 24, 2018, Kane led at least one Hydro investor (and a member of Hydrogen's Board) to believe that Hydro "WILL have value."

73.     Indeed, in a February 17, 2018 email, the same investor and Board member wrote to Kane: "[a]s everyone has acknowledged that these digital assets [Hydro] may accrete in value over time, your contention that this [the airdrop] was merely a software delivery is tenuous."

74.     A few days later, at a Hydrogen Board meeting, the same investor and Board member insisted several times that it was "ridiculous" for Hydrogen to continue to claim Hydro tokens had no value.

75.     When asked about the value of Hydro on a Reddit Ask-Me-Anything ("AMA") thread on May 12, 2018, Hydrogen responded, "Our team has been working very hard to increase awareness [of the token and the platform] through reddit, medium, twitter and telegram. We have seen amazing success so far . . . ."

76.     Also, in May 2018, Kane appeared on a podcast and claimed that Hydrogen was very profitable and was "growing very very very fast," signaling that its efforts to develop the Hydrogen platform were on track.

77.     In addition, in an October 2018 post on its Medium blog, Hydrogen touted the variety of applications that purportedly could be developed using Hydro on the platform and emphasized that "the digital advertising market now produces over $88 billion in revenue."

78.     Further, Hydrogen sought to create the appearance of demand for, and thus an increase in value of, Hydro by claiming that its financial institution clients—who utilized only the company's non-blockchain API, for which Hydro had no functionality—could use Hydro to access and use certain Hydrogen platform functions.

79.     For example, in the May 1, 2018 weekly email update to Hydro token holders, Hydrogen and Kane told investors they would soon announce "dozens of companies integrating Hydro API and using our Hydro app", as well as additional partnerships and "new exchange platforms."

80.     Likewise, when asked in the May 12, 2018 Reddit AMA thread if the company was "in talks with any financial institutions that are interested in utili[z]ing a Hydro blockchain token based solution", Hydrogen responded that many of its clients were interested and added, "[w]e are confident that our product is attractive enough to be used by them and we have a major advantage with them already paying for our other products."  In the same AMA thread, when asked if any existing API clients had inquired about Hydro, Hydrogen replied, that "all" of its clients were "interested" in and "talking to [the company] about Hydro."

81.     However, as Kane acknowledged in a private communication with Ostern in late-January 2019, Hydrogen's "API clients" were not required to use Hydro in any part of the

Hydrogen platform.  Ostern replied, "Oh really?  So everything is Fiat [currency] and the token has no real utility?"—to which Kane responded, "not right now . . . ."

82.    Nevertheless, Hydrogen repeatedly touted its growing number of non-blockchain API partnerships with major financial institutions to signal the growth of the Hydrogen platform and increased demand for the Hydro token.

83.    For example, on March 2, 2018, Hydrogen's Blockchain Engineer stated on the company's Telegram channel that "adoption of this [Hydro] token will be valuable to us as we convince companies to use it [on the platform] alongside our other products," thereby reinforcing that the value of the token was linked to and in fact depended on the company's efforts to grow the Hydrogen platform.

84.    Further, once Hydro became listed and available for trading, Hydrogen and Kane routinely informed their community of token holders when Hydro's trading volume was highly ranked on specific crypto asset trading platforms.

85.    Hydrogen and Kane also publicly stated that Hydrogen did not sell Hydro to its API clients because "they are purchasing [Hydro] on their own" on the secondary market.

86.    While Hydrogen and Kane were seeking to have Hydro listed on crypto asset trading platforms and after the token was available for trading, Hydrogen continued to highlight its management and development teams, in particular their prior experience at hedge funds and large financial institutions and with launching another fintech company.

87.    As part of their strategy to increase the demand for and value of Hydro, Hydrogen and Kane disseminated news and updates about the company, its platform development, the public distribution of the Hydro token, and the trading market for Hydro.  Kane then intended to

capitalize on Hydro's increased value by selling the company's Hydro at inflated prices to raise funds for the company.

**V.   Kane And Hydrogen Hired Moonwalkers To Manipulate The Price And Volume Of Hydro And Reap Greater Profits From The Offers And Sales Of The Company's Hydro**

88.   In May 2018, Kane told Hydrogen's Board that the company was going to run out of cash by October of that year.  This was consistent with what Kane had told the Board earlier, in February 2018—that the company had cash on hand to sustain operations for approximately 8 to 10 months from then.

89.   To raise capital, Kane told the Board at the May 2018 meeting that the company would have to sell about $1 million worth of Hydro, either in a private sale to a venture capital firm, hedge fund, or asset manager, or publicly into the secondary trading market Hydrogen and Kane had created and were continuing to create.

90.   Later, on or around July 12, 2018, Kane proposed a fundraising plan to Hydrogen's Board to sell $1-5 million in Hydro from the company's repository and into the secondary market to raise revenue.

91.   However, Kane had already begun selling Hydro from the company's repository, using his own personal trading accounts with crypto asset trading platforms, two months earlier, in May 2018.  Between May 9 and October 7, 2018, Kane sold 472,141,735 Hydro (approximately 4.25% of the total minted supply) from Hydrogen's repository using his personal trading accounts.

92.   Kane did so despite the fact that he and Hydrogen publicly stated, in a May 18, 2018 Medium blog post, that Hydrogen had no plans to distribute any of its Hydro and that, in the event of a planned distribution from the repository, the company would "alert the Hydro community with 30 days['] notice."

93.     However, at no point did Hydrogen or Kane disclose Kane's selling of Hydro from the company's repository, or Ostern's subsequent sales of the company's Hydro.  In fact, in April 2018, Kane told one U.S.-based crypto asset trading platform on which Hydro was later listed that the company would only sell its tokens as needed to pay for Ethereum costs tied to the Hydrogen platform.

94.     After Kane began selling the company's Hydro through his personal trading accounts with crypto asset trading platforms, he quickly learned that the considerable volume of Hydro that Hydrogen needed to sell to raise sufficient cash would significantly depress, and did significantly depress, Hydro's price on the secondary market thus making it difficult to raise such funds.

95.     As a result, in July 2018, Kane began searching for a crypto asset "market making" firm to use the company's Hydro to create the appearance of increased Hydro trading volume on the secondary market, and prop up Hydro's price so that the company could sell its Hydro into that market without significantly depressing the token's price, and enabling Kane and Hydrogen to raise their desired capital.

96.     In late July and again in August 2018, Kane informed Hydrogen's Board that the company would begin searching for "above board market makers" to help put forward a realistic token sale strategy.

97.     During that same timeframe, Kane directed two members of Hydro's core team to preview the services provided by a list of "market makers" he compiled after conducting his own preliminary research and reviewing the websites and marketing materials of the firms he had identified—including Moonwalkers.

98.     The name "Moonwalkers," which Ostern selected, derives from the expression "going to the moon," which is used by crypto enthusiasts and issuers to describe the potential significant appreciation in price or value of crypto assets.

99.     On its website at the time, Moonwalkers described its services as follows:

> We work closely with your teams to ensure our market making efforts are even more effective….We then create stability while *we subtly direct the Coin or Tokens['] price and volume upward*; using our in-house software solutions.

> Using our in-house software, we are able to transact thousands of trades a second.  This allows us to create volume in such a way that has been unheard of in the space.  *(Don't worry, we've gone to great lengths to ensure that our strategies in doing so, look as organic as possible.  They are ind[is]cern[i]ble from organic trades.)*

> We've developed strategies to sell your tokens in such a way that does not harm the market price of your coin/token while making market.  *(In fact, we sell in such a way that actually facilitates upward movement!)*.

100.     On or around August 6, 2018, Ostern provided a demonstration of Moonwalkers' "in-house software" to Hydrogen employees, after which one employee, Hydrogen's Blockchain Engineer, informed Kane over email, "[t]hey seem to have a pretty robust trading bot"—a computer program used to automate trades.  In the same email, Hydrogen's Blockchain Engineer told Kane, "[t]hey would be providing the liquidity and market making to make sure our selling doesn't lower the price" of the Hydro token.

101.     In an email on September 17, 2018, just weeks before Kane had projected Hydrogen would run out of cash, Kane instructed Hydrogen's Head of Financial Engineering to "get the market making firm(s) set[]up for October 1."

102.     After comparing Moonwalkers' proposed cost and the quality of its trading bot to the other market making firms under consideration by Hydrogen, Kane signed off on retaining Moonwalkers on or around October 1, 2018.

103.    On October 4, 2018, Hydrogen and Moonwalkers executed a Market Making Services Agreement, pursuant to which Moonwalkers would provide "market making" and other services for a fixed fee of $9,000 per month beginning October 9, 2018.  Ostern signed the agreement on behalf of Moonwalkers.  Ostern was ultimately compensated by Hydrogen in exchange for his "market making" services.

104.    Pursuant to that agreement, Moonwalkers agreed, among other things, to "provide market making services" to Hydrogen and sell the company's Hydro tokens—while "devaluing the price of [Hydro] as little as possible"—on two specified crypto asset trading platforms, including one based in the U.S.  As part of the agreement, Hydrogen also provided 5 Bitcoin to Moonwalkers to carry out these services.  The agreement also authorized Moonwalkers to use Hydro-trading proceeds to carry out its "market making" services.  At the conclusion of the contract, Moonwalkers was required to return the 5 Bitcoin and all trading proceeds, less any trading fees incurred.

105.    As a result, between October 2018 and April 2019, Ostern and Moonwalkers—at Kane's direction and with Hydrogen's knowledge—used the company's Hydro to manipulate the price and trade volume of Hydro, in order to induce crypto asset traders to purchase Hydro and enable Ostern to sell the company's Hydro at a greater profit.

106.    To initiate Ostern's and Moonwalkers' "market making" on behalf of Hydrogen, Kane provided Ostern with the login credentials to access his personal trading accounts on the two specified crypto asset trading platforms, one of which Kane had recently upgraded to a "corporate" account that could facilitate higher trading volume and faster token sales.  In addition, Kane transferred, and directed others at Hydrogen to transfer, Hydro from the company's repository, as well as Bitcoin and ETH, to the two trading accounts used by Ostern.

107.     Ostern and Moonwalkers created a customized trading bot for Kane and Hydrogen to create the appearance of active trading in Hydro and to allow Ostern to sell the company's Hydro on trading platforms without depressing the token's price.

108.     Moonwalkers' trading bot deployed a mix of automatic and semi-automatic functions to place-and-cancel buy and sell orders at random increments to create the false appearance of robust market activity, which was intended by Kane, Hydrogen, and Ostern to induce other market participants to trade Hydro.

109.     The artificially-inflated trading volume created by Ostern, at Kane's direction, enabled Ostern to sell Hydro from Hydrogen's company repository into the secondary crypto market with minimal impact on Hydro's price.

110.     Further, Ostern manually executed the Moonwalkers bot's semi-automatic options, including by setting trade limits to carry out limit orders, which are orders to purchase or sell a security at a pre-specified price or better.

111.     In addition, Ostern manipulated the Hydro market by placing multiple orders to buy or sell Hydro that Ostern never intended to execute, *i.e.*, non-bona fide or what Ostern termed "zombie" orders."  These non-bona fide or "zombie" orders were intended to create the false appearance of market interest and increase Hydro's price so that Ostern could then execute bona fide orders—selling the company's Hydro—at more favorable prices.  After executing his bona fide orders at the manipulated prices, Ostern would cancel and clear his prior "zombie" orders from the U.S. trading platform's limit-order pools.  In fact, in an October 9, 2018 email, Moonwalkers asked for Kane's assistance in "manually clearing zombie orders", to which Kane replied, "[w]e're online all day and night, so it's not an issue."

112.    Ostern described this manipulative trading strategy as "spoofing."  Spoofing or "layering" refers to the use of fake or non-bona fide orders in a particular security to push the market for that security in a particular direction and obtain a more favorable execution of bona fide orders on the opposite side of the market—at which point the non-bona fide orders are then cancelled.

113.    From the outset, in October 2018, Kane and Hydrogen provided input on the trading bot's objectives, instructing Moonwalkers to sell 200-400 million Hydro (approximately 1.8-3.6% of the total minted supply) per month, or an average of about 10 million per day, and to sell as much as Hydro as it could while keeping the price of the token afloat, thereby enabling Hydrogen and Kane to profit from sales of the company's Hydro.

114.    Specifically, Kane provided the monthly Hydro sales target to Ostern in an October 13, 2018 email.  In the same email, Kane told Ostern that, with his trading of the company's Hydro, he would convert Hydro sales proceeds from Bitcoin to U.S. dollars and transfer that money to Hydrogen's bank account, but offered to leave "extra" Bitcoin in his trading platform account to be used by Ostern to "make" and manipulate a market in Hydro. Kane concluded his email by reiterating his and Hydrogen's objective: "to raise cash through these sales."

115.    In his reply email the same day, Ostern told Kane he "[u]nderstood" the monthly sales target and added: "We're constantly playing both sides to get the price to move upward. [Hydro] get sold into a bit but cancel after a certain percentage is filled to ensure that we're not buying back all the tokens we just sold."  And, with respect to Kane's offer to leave "extra" Bitcoin in his trading platform account, Ostern replied: "yeah definitely try to keep a little in there for manipulation if you can per month."  In that reply email, Ostern also told Kane that he

would "slowly ramp things up over time" so that they could "have a larger amount of liquid capital rotating through for profit, as well as subtly moving the price [of Hydro] upward."

116.    In addition to directing Ostern regarding the target volume of Hydro to be sold and conveying to him their trading objectives, Kane and Hydrogen also directed and participated in the scheme by continuously allocating Hydro (and Bitcoin and ETH) for Ostern to use and holding regular calls with Ostern to ensure their objectives were being met.

117.    Further, as part of the market manipulation scheme, Hydrogen and Moonwalkers maintained a private Slack channel through which Ostern provided Kane and Hydrogen with updates about his efforts to artificially inflate Hydro's trading volume and prop up the price of the token on the two trading platforms.

118.    For example, on October 11, 2018, Ostern wrote the following to Kane in the private Hydrogen-Moonwalkers Slack channel:

> *We're starting off slow, trying to keep the sell pressure minimal until we can build enough capital to really get the market moving upward.* Down the road a little ways we'll try and keep you guys at the top of CMC[5] / Exchange Lists.  Try not to push too hard on selling now, *we'll have plenty of excuses to pump price and sell into the FOMO[6] guys down the road*.  Not to mention high volume days.

119.    A week later, on October 18, 2018, Ostern wrote to Kane: "We get into the [online] trade chats and kind of try and fomo people in.  (And talk you up in chat)."

---

[5]    CMC, or CoinMarketCap, is an online platform that ranks crypto assets by trading volume.

[6]    In the crypto asset space, "FOMO" or "fear of missing out" typically refers to a sharp increase in the price of a crypto asset occurring where investors "fear" that they may lose out on profiting from the remainder of a "bullish breakout," when a crypto asset's price moves above its previously established resistance level (a price point at which an asset encounters considerable selling pressure), signaling a trend upward.

120.   On October 21, 2018, Ostern updated Kane again:

> Set the bot pretty aggressively now that we've got a little more capital to play with.  Now using the [C]huck [Norris] account [on Hydrogen's Telegram channel] to spread the news a bit . . . Hop on a call quick Mike?  Have a tactic we've used a few times that works, I'd like to explain a bit.  ***Basically we're going to insight [sic] a firesale to shake the weak hands, and get the sell walls to move down a bit so we gain position then push price hard***.

121.   The same day, upon Ostern setting the bot aggressively and touting Hydro on Telegram, Hydro's market volume increased from less than 5 million Hydro to a peak of over 15 million as a result of the buy order pressure exerted by the Moonwalkers' bot between 12:00 p.m. and 3:00 p.m. ET.

122.   On October 26, 2018, Ostern and Kane communicated on the private Hydrogen-Moonwalkers Slack channel about Ostern's efforts to increase Hydro's trading volume, at Kane's direction.  Specifically, Ostern wrote to Kane: "Did a little volume shenanigans . . . #1 volume on [the U.S.-based trading platform] . . . Around half is fake, took about 3 seconds for bot to generated [sic] about a million."  Kane responded, "Yes saw that, lots of volume.  It helps to attract other exchanges, we get 1-2 a week now to reach out."

123.   Between October 8, 2018, and January 31, 2019, Kane's account at the U.S.-based trading platform was consistently in the top 3 of daily Hydro traders, often accounting for more than 50% of all daily buy and sell order and cancellation volume, up from the average of less than 5% prior to when Moonwalkers' began trading.

124.   During the same period, Kane's account with the same U.S. trading platform typically had a fill rate[7] of 3% to 15%, which was low, due at least in part to the large number of non-bona fide or "zombie" orders Ostern placed and cancelled.

---

[7]      A "fill rate" measures the number of units executed as a fraction of the units ordered.

125.    While Ostern was manipulating the market in Hydro and selling Hydrogen's Hydro tokens through Kane's crypto asset trading platform accounts, Kane continued to sell Hydro through new, separate trading accounts he created.

126.    Neither Kane nor Hydrogen ever publicly disclosed Kane's or Ostern's sales of Hydro from the company's repository.

127.    In January 2019, in Hydrogen's internal "Kickoff Video," Hydrogen told its employees that the company had achieved revenue of over $2 million from "property sales" in 2018.  In fact, this amount represented Hydrogen's sales of Hydro in the secondary market through Moonwalkers and Kane.

128.    Hydrogen's financial statements for 2018 and 2019, which were not filed with the SEC or otherwise publicly disclosed, reflected a total of approximately $2.22 million in "cryptocurrency revenue."

129.    The cash raised through Ostern's sales of Hydro, at Kane's direction and on Hydrogen's behalf, permitted the company to continue operations and forgo the need to raise capital from other sources.

130.    By engaging in the market manipulation described above, Ostern, Kane, and Hydrogen knew, or were reckless in not knowing, they were engaged in manipulative, deceptive, and fraudulent conduct, because Ostern's sales of Hydro and market manipulation—carried out at Kane's and Hydrogen's direction and with their knowledge and active participation—were intended to create the false appearance of robust Hydro trade volume and artificially prop up the token's price, in order to induce market participants to trade in Hydro and ensure that Hydrogen reaped greater profits from the sales of its Hydro tokens.

**VI.    Defendants Offered And Sold Hydro Tokens As Investment Contracts, And These Offers And Sales Of Securities Were Not Registered With The SEC**

131.    Hydrogen and Kane offered and sold Hydro as investment contracts, or securities, through Hydrogen's bounty programs and employee compensation, and through Defendants' offers and sales of Hydro in the crypto asset trading market.

132.    Moonwalkers also offered and sold Hydro as an investment contracts through crypto asset trading platforms.  By selling Hydro tokens on behalf of Hydrogen and Kane, Ostern played a substantial role in, and indeed was an essential part of, Hydrogen's scheme to offer and sell Hydro, and at a minimum Ostern engaged in steps necessary to the distribution of Hydro.

133.    Notwithstanding their attempts to circumvent the federal securities laws' registration requirements, Hydrogen and Kane marketed Hydro as an investment in Hydrogen's enterprise.  The economic reality and substance of what Hydrogen and Kane were offering and selling—investments in Hydro—was clear.  Hydro purchasers would have reasonably expected, and were led by Hydrogen and Kane to expect, to profit from Hydrogen's stated efforts to develop the Hydrogen platform and list Hydro on trading platforms.

134.    *First*, the offers and sales of Hydro tokens by Hydrogen and Kane, including through Ostern, involved an investment of money.  Those who purchased Hydro on trading platforms, including U.S. investors, paid with U.S. dollars or with Bitcoin and ETH.  Further, Hydrogen employees and bounty program participants obtained Hydro in exchange for the value of their labor, services, and efforts to market, promote, and develop the Hydrogen platform.

135.    *Second*, Hydro purchasers invested in a common enterprise because their fortunes were tied to those of other Hydro investors, and to those of Hydrogen and Kane.

136.    Hydro investors' fortunes were tied to each other, because if Hydro increased in value, all investors would share in that increased value on a *pro rata* basis.  Hydro investors also

31

had a shared interest in the growth of the Hydrogen platform and thus the demand for and value of Hydro, which was inextricably linked to the development of the platform. In addition, the proceeds of Hydrogen's and Ostern's sales of Hydro on crypto asset trading platforms were pooled in Hydrogen's accounts.

137.    Hydro investors' fortunes were also tied to those of Hydrogen and Kane. For example, because Hydrogen, Kane, and other company employees held approximately 65% of the total pool of Hydro in circulation, including 35% in the company's repository, their interest in Hydro appreciating in value was aligned with, and indeed the same as, that of Hydro investors.

138.    *Third*, Hydro investors were led by Hydrogen and Kane to reasonably expect that they would receive profits from their Hydro investments based on the managerial efforts of others, including Hydrogen and Kane. As Hydrogen and Kane made clear in Hydrogen's public promotional and marketing materials and on its website and social media pages and channels, the value of Hydro depended entirely on Hydrogen's and Kane's efforts, including to develop and manage the Hydrogen platform. In marketing Hydro, Hydrogen and Kane repeatedly touted Hydrogen's profitability, accelerated growth, and the Hydrogen team's blockchain and fintech expertise and experience. They also touted its "long-standing relationships" and partnerships with major financial firms as part of the company's non-blockchain API business.

139.    Hydrogen and Kane also led Hydro investors to reasonably expect to profit from their Hydro investments by publicly touting the results of their efforts to have Hydro listed on trading platforms, where investors would be able to sell their Hydro at a profit. For example, as discussed above, Hydrogen publicly announced each new platform listing of Hydro on its social media pages and channels, signaling to investors the opportunity to profit from sales on those platforms.

140.     Sections 5(a) and 5(c) of the Securities Act require an offeror of securities to register its offers and sales of securities with the SEC.  Hydrogen's and Kane's offers and sales of the company's Hydro tokens, as well as Ostern's sales for the company, were not registered with the SEC, and no registration exemption was available.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Violations of Section 5(a) and 5(c) of the Securities Act**
**(All Defendants)**

141.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 140, as though fully set forth therein.

142.     By reason of the conduct described above, without a registration statement in effect as to that security, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, and (b) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

143.     Hydrogen violated Sections 5(a) and 5(c) of the Securities Act by, from as early as January 2018 through at least April 2019, directly and indirectly making use of the means and instruments of transportation or communications in interstate commerce or of the mails to offer and sell Hydro tokens, via bounty programs, employment compensation, and sales in the secondary trading market, without a registration statement in effect as to any offers or sales of Hydro, and by making use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell Hydro tokens, which were offered and sold as securities, as to which no registration statement had been filed.

33

144.     Kane violated Sections 5(a) and 5(c) of the Securities Act by, from as early as January 2018 through at least April 2019, directly and indirectly making use of the means and instruments of transportation or communications in interstate commerce or of the mails to offer and sell Hydro tokens, via bounty programs, employment compensation, and sales in the secondary trading market, without a registration statement in effect as to any offers or sales of Hydro, and by making use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell Hydro tokens, which were offered and sold as securities, as to which no registration statement had been filed.

145.     Ostern violated Sections 5(a) and 5(c) of the Securities Act by, from as early as October 2018 through at least April 2019, directly and indirectly making use of the means and instruments of transportation or communications in interstate commerce or of the mails to offer and sell Hydro tokens, via sales of Hydrogen's Hydro tokens in the secondary trading market using Kane's personal trading accounts with crypto asset trading platforms, without a registration statement in effect as to any offers or sales of Hydro, and by making use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell Hydro tokens, which were offered and sold as securities, as to which no registration statement had been filed.

146.     By virtue of the foregoing, Defendants violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)**
**(All Defendants)**

147.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 140, as though fully set forth therein.

148.     By reason of the conduct described above, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by the use of the means and instruments of interstate commerce or of the mails, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

149.     Ostern, Kane, and Hydrogen knew, or were reckless in not knowing, they were engaged in manipulative, deceptive, and fraudulent conduct, because, among other things, Ostern's sales of Hydro and market manipulation—carried out at Kane's and Hydrogen's direction and with their knowledge and active participation—were intended to create the false appearance of robust Hydro trade volume and artificially prop up the token's price, in order to induce market participants to trade in Hydro and ensure that Hydrogen reaped greater profits from the sales of its Hydro tokens.

150.     By virtue of the foregoing, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a), (c)] promulgated thereunder.

### THIRD CLAIM FOR RELIEF
**Violations of Securities Act Section 17(a)(1) and (3)**
**(All Defendants)**

151.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 140, as though fully set forth therein.

152.     By reason of the conduct described above, Defendants, in the offer or sale of securities, acting with the requisite degree of scienter, by the use of the means and instruments of transportation and communication in interstate commerce or by use of the mails, directly or indirectly, Defendants, knowingly or recklessly, employed devices, schemes or artifices to

defraud, and knowingly, recklessly, or negligently engaged in a transaction, practice or course of business which operated or would operate as a fraud or deceit upon the purchaser of such securities.

153.     Ostern, Kane, and Hydrogen knew, were reckless in not knowing, and should have known they were engaged in manipulative, deceptive, and fraudulent conduct, because, among other things, Ostern's sales of Hydro and market manipulation—carried out at Kane's and Hydrogen's direction and with their knowledge and active participation—were intended to create the false appearance of robust Hydro trade volume and artificially prop up the token's price, in order to induce market participants to trade in Hydro and ensure that Hydrogen reaped greater profits from the sales of its Hydro tokens.

154.     By virtue of the foregoing, Defendants violated, and unless enjoined will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)].

### FOURTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
### (All Defendants)

155.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 140, as though fully set forth therein.

156.     By reason of the conduct described above, Defendants directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange or any member of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities, creating actual or apparent active trading in such securities and/or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others, including but not limited to Ostern's actions, directed by Kane and Hydrogen and with their knowledge and active

participation, to engage in market manipulation that affected the volume and prices of such securities for the purpose of inducing the purchase or sale of such securities by others.

157.    Hydrogen, Kane, and Ostern acted with the intent to induce trading by others.

158.    By virtue of the foregoing, Defendants violated, and unless enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 20(b) of the Exchange Act**
**(Kane and Hydrogen)**

159.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 140, as though fully set forth therein.

160.    By reason of the conduct described above, Kane and Hydrogen, directly or indirectly, committed violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)] and Sections 9(a)(2) and 10(b) [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)] through or by means of Ostern, including through Ostern's fraudulent manipulation of the Hydro securities market which he carried out at Kane's and Hydrogen's direction and with their knowledge and active participation.

161.    By virtue of the foregoing, Kane and Hydrogen violated, and unless enjoined will continue to violate, Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 15(a) of the Exchange Act**
**(Ostern)**

162.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 140, as though fully set forth therein.

163.    By reason of the conduct described above, Ostern was and acted as an unregistered broker or dealer, by making use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of Hydro.  Specifically, Ostern, who has never been registered with the SEC in any capacity, effected trading in crypto asset securities, on Hydrogen's behalf, through controlled sales of the company's Hydro tokens, to generate profits for Hydrogen, and he received compensation from Hydrogen for these services.

164.    By virtue of the foregoing, Ostern violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter Final Judgments:

### **I.**

Finding that Defendants violated the statutes and rules set forth in this Complaint as to each;

### **II**.

Permanently restraining and enjoining Defendants, and all person in active concert or participation with them, from violating, directly or indirectly, the statutes and rules set forth in this Complaint as to each;

### **III.**

Ordering Defendants to disgorge all ill-gotten gains derived from their illegal conduct as set forth in this Complaint, including prejudgment interest thereon pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (d)(7)];

**IV.**

Permanently barring Defendant Kane from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**V.**

Prohibiting Defendants from participating, directly or indirectly, including, but not limited to, through any entity controlled by them, in any offering of securities, including crypto asset securities, provided, however, that such injunction shall not prevent either Kane or Ostern from purchasing or selling securities, including crypto asset securities, for his own personal account, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

**VI.**

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VII.**

Granting such other and further relief as this Court determines to be necessary and appropriate; and

**VIII**.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC demands that this case be tried to a jury.


Dated: September 28, 2022     Respectfully submitted,

U.S. SECURITIES AND EXCHANGE COMMISSION

By:     */s/ Christopher J. Carney*
        Nicholas C. Margida (*pro hac vice* application to be filed)
        Christopher J. Carney
        U.S. Securities and Exchange Commission
        Division of Enforcement
        100 F Street, N.E.
        Washington, DC 20549-5977
        (202) 551-8504
        MargidaN@sec.gov

        *Counsel for Plaintiff U.S. Securities and Exchange Commission*


Of Counsel:
Paul E. Kim
Sonia G. Torrico
Kathleen Hitchins